UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT
FILED
SEP 30 2017
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

_____

SHANNON PEEK and TANESHA
WILLIAMS,

         Plaintiffs,

      v.

PINES APARTMENT LLP and WINN
RESIDENTIAL,

         Defendants.

_____

**DECISION & ORDER**
10-CV-6665

## Procedural History

Plaintiffs Shannon Peek and Tanesha Williams commenced this action in 2010 alleging that the defendants denied them housing based on their religion, in violation of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 et seq. See Complaint (Docket # 1). On December 30, 2016, defendant Winn Residential filed a motion for summary judgment. See Docket ## 55, 56. Co-defendant Pines Apartment, LLP filed an affirmation on the same day joining in the motion for summary judgment. See Docket # 54. Plaintiffs filed a response on February 14, 2017, and defendant Winn Residential replied on February 28, 2017. See Docket ## 59, 61.

The Court heard argument from all parties on May 4, 2017 (Docket # 63), and requested supplemental briefing. Defendant Pines Apartment, LLP submitted supplemental materials on May 8, 2017. See Docket # 62. Plaintiffs filed supplemental briefing on May 15, 2017 (Docket # 64), and Winn Residential filed a response on May 25, 2017. See Docket # 65. For the reasons

stated below, the defendants' motion for summary judgment (Docket # 55) is **granted.**[1]

## Factual Background

Even viewing the facts in the light most favorable to the plaintiffs, much of the chronology relevant to plaintiffs' claims of discrimination is not in dispute. The record before this Court can generally be divided into two categories – evidence regarding plaintiffs' application to reside at the Pines of Perinton apartment complex and evidence regarding how The Pines of Perinton processed, and ultimately denied, plaintiffs' application.

Plaintiffs' Application to The Pines: Defendant Pines Apartment, LLP operates an apartment complex, Pines of Perinton ("The Pines"), which is owned and managed by co-defendant Winn Residential[2] (collectively "defendants"). Addy Dep., Ex. "A" attached to Def.'s Mot. for Summ. J. (Docket # 55-4) at 64. The Pines is a 508-unit apartment building which "provides safe and affordable housing for individuals and families" with "low" and "very low" incomes. Resident Selection Plan, Ex. "C" attached to Def.'s Mot. for Summ. J. (Docket # 55-6) at 4. Pursuant to a

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73 the parties have consented to the jurisdiction of this Court for all proceedings, including dispositive motions. See Docket # 15.

[2] Property Manager for Winn Residential Michele Addy testified that Pines Apartment, LLP does not have any employees. All thirteen employees at The Pines are employed and paid by Winn Residential. Their paychecks, however, come from Pines of Perinton, LLP. See Addy Dep. at 64-65.

2

Rental Assistant Payment Contract, The Pines accepts rental subsidies ("Section 8 Vouchers") from the Department of Housing and Urban Development ("HUD") for a percentage of the 508 units. Id. Because it accepts federal assistance, The Pines is subject to HUD guidelines in the application process, including all federal fair housing laws. Id. In addition, The Pines is subject to audits by the New York State Department of Homes and Community Renewal. See Addy Dep. at 157.

Plaintiffs Shannon Peek and Tanesha Williams (collectively "plaintiffs") are a married Muslim couple who dress in traditional attire. See Williams Dep., Ex. "A" attached to Def.'s Mot. for Summ. J. (Docket # 55-4) at 7, 25-27; Peek Dep., Ex. "A" attached to Def.'s Mot. for Summ. J. (Docket # 55-4) at 56. Ms. Williams wears what is generally referred to as a burka, which includes two black scarves that cover her neck, face, eyes, and mouth. Williams Dep. at 25-27.

Sometime in October 2009 Mr. Peek went to The Pines rental office and picked up an Applicant Document Package ("Application Package") from Stephanie Glatz, an administrative aid at The Pines. Peek Dep. at 42. Plaintiffs were familiar with The Pines because Mr. Peek's sister-in-law, Roseline Louis, had lived in an apartment at The Pines. Both Ms. Williams and Mr. Peek had visited Ms. Louis' apartment in the past. Williams Dep. at 9-10. Ms. Louis is also Muslim and dresses in

3

traditional clothing. Id. at 39.

Included within the Application Package that Mr. Peek picked up were several notices and HUD forms, as well as a twelve page "Application for Admission and Rental Assistance." Pl.'s App., Ex. "D" attached to Def.'s Mot. for Summ. J. (Docket # 55-7). Mr. Peek filled out the application at home. Peek Dep. at 42. The application listed Ms. Williams as head of the house and Mr. Peek as a co-tenant, and noted that they had a Section 8 Voucher from the Rochester Housing Authority. See Pl.'s App. at 7, 10.

The Pines' rental application asked for a variety of information from applicants, but for purposes of this motion, the most relevant is the requirement that an applicant provide rental history from the previous five years. Id. at 4. The form asked for the names and addresses of past landlords and the locations of the prior residences. Plaintiffs filled in the five provided spaces with the following rental history information:

(1) Joe D'Alessandro, 71 Lorenzo St., Rochester NY 14611, lived for three months;

(2) Shane E. Peek, 36 Potter St., Rochester NY 14606, lived for one year;

(3) Tassama Alawal, Cairo Egypt Africa, lived from Oct '07-Sept. '08;

(4) Patrick Gallo, 19 Carthiage St., Rochester NY 14621, lived for one years;

4

(5) Jeniffer ?, Foster Block Apts, Clifton Springs, lived for one years.

Id. Mr. Peek brought the completed application back to the rental office and left it with Ms. Glatz. Peek Dep. at 43. Sometime thereafter, Mr. Peek recalls calling The Pines to check on the application and being told that his wife needed to sign the rental application. Id. at 44.

On October 16, 2009, Ms. Williams went to The Pines' office to sign the application. Ms. Williams entered the rental office while her husband stayed in their car. Ms. Williams met with Kiera Sanchez, an Occupancy Specialist at The Pines, who showed Ms. Williams where to sign the application forms. See Williams Dep. at 11-12; Sanchez Dep., Ex. "B" attached to Def.'s Mot. for Summ. J. (Docket # 55-5) at 20, 69-72. Ms. Sanchez reviewed and then accepted the completed application. Sanchez Dep. at 71-72.

Five days passed without plaintiffs hearing anything, so Ms. Williams followed up on October 21, 2009 by telephoning The Pines to check on the status of her application. Williams Dep. at 16-18. Ms. Williams spoke to Stephanie Glatz and, after being placed on hold for a minute, was informed that her application had been denied for "insufficient income." Id. at 17. Ms. Williams immediately told her husband about her conversation with Ms. Glatz. Id. Mr. Peek then called The Pines himself and also spoke to Ms. Glatz. He asked her how

5

their application could be denied for "insufficient income" when they had a Section 8 Voucher which would cover their rent. Peek Dep. at 45-47. Mr. Peek could hear Ms. Glatz speaking to someone else in the office and then was put on hold. When she came back on the line, Ms. Glatz told Mr. Peek that she would call him back. Id. Sometime thereafter, The Pines notified plaintiffs that an error had been made and they would continue to process plaintiffs' application.

On November 5, 2009, Ms. Williams called ahead and then went to The Pines for a walk-through of an available apartment. She was accompanied by her mother-in-law. Williams Dep. at 20. Ms. Williams testified that when she arrived, she was told by Ms. Sanchez that there was no one available to show an apartment. Id. at 15. Sanchez gave Williams a blueprint of the apartments so she could see the measurements. According to Ms. Williams, the conversation escalated when Ms. Williams stated that she would still like to see an actual apartment, and Ms. Sanchez "snatched" the blueprint out of Ms. Williams' hand. Id. at 15-16. Plaintiff asked, "is there a problem because we've been having such a problem with you since we've been applying, and it seems as though there's a really big problem with me just simply coming in to ask to see an apartment." Id. at 15. At that point, Michelle Addy, the Property Manager, heard loud voices and came out of her office "to see what the situation

was." Addy Dep. at 71. Ms. Addy asked Ms. Glatz, who was on her lunch break, to show Ms. Williams a vacant apartment. Id. Ms. Glatz accompanied Ms. Williams and her mother-in-law as they inspected an apartment. Williams Dep. at 33-34.

On November 11, 2009, Mr. Peek returned to the rental office to check on the status of their application. He spoke to Ms. Sanchez who gave him a form "letter of denial." Peek Dep. at 53. After seeing that his application was denied, Mr. Peek asked Ms. Sanchez if she could have Ms. Addy sign off on the denial letter. Ms. Sanchez brought the letter "back in" to the office and when she returned the letter to him it was signed by Ms. Addy. Id. According to Mr. Peek, the letter stated that their application was denied because of "poor rental history." Id.; see Ex. "F" attached to Def.'s Mot. for Summ. J. (Docket # 55-9). The couple sent a handwritten letter to The Pines requesting an appeal of the decision, but never received a response. Williams Dep. at 28-29.

The Pines' Tenant Application Process: In selecting tenants to reside at The Pines, a specific screening process is supposed to be followed when reviewing applications. The process is set forth in "The Pines of Perinton Resident Selection Plan."[3] See Ex. "C" attached to Def.'s Mot. for Summ.

---

[3] Defendants maintain that the Resident Selection Plan is a policy document required by HUD and that as a HUD directive it must be followed. Addy Dep. at 77.

7

J. (Docket # 55-6). According to the Plan, "[a]pplications will be screened in accordance with program eligibility requirements and the criteria set forth in the Resident Selection Plan." Id. at 6. Section XII of the Plan sets forth the "Applicant Screening" criteria: (1) Credit History (2) Criminal History; (3) Rental History; and (4) Income Verification. Id. at 15-18. The Rental History criteria, as set forth in the Plan is as follows:

Rental History. Each applicant must provide the most recent five years verifiable rental history, or the last three consecutive places of residence, whichever is greater. The rental history of each adult household member will be reviewed and rated by a national scoring firm using the following minimum requirements:

1. No evictions for non-payment of rent where a current balance remains owing to a previous landlord.

2. No history or disturbances or behavior that interfered with the landlord or the rights of other residents/neighbors.

3. An incident or incidents of actual or threatened domestic violence, dating violence or stalking will not be construed as serious or repeated violations of a lease or substantiations for denying occupancy rights of a victim of abuse.

Id. at 15. Section XIII of the plan provides that an application may be rejected for a variety of reasons including when the "applicant does not meet the property screening criteria." Id. at 18.

Michelle Addy and Kierra Sanchez testified about how the

8

screening process was implemented during the relevant time period. The first step in the process is that the applicant had to personally appear at the rental office to submit an application. A personal appearance was required because, in addition to their signed and completed application form, the applicant had to provide copies of various documents such as picture identification and a social security card. Sanchez Dep. at 44, 60. Once complete, the application would be date and time stamped and the applicant would be placed on a waiting list until the type of apartment or townhouse they sought became available. According to Ms. Sanchez, there was "always" a waiting list for apartments at The Pines. Id. at 47-48.

Once the application was determined to be signed and complete, certain information on the application would be entered into a leasing software program called Boston Post. Id. at 45. The application would remain dormant on the wait list until an apartment became available; then, the screening process would begin. The screening criteria would be evaluated in the following order: credit check, criminal background check, landlord history and finally income and asset information. Id. at 51. If an applicant did not meet a particular criterion, the leasing agent would not evaluate the application further and the applicant would be notified that their application was denied. Id. at 52-56.

Both Sanchez and Addy testified that the first two screening criteria (credit check and criminal record check) were screened pursuant to a contract Winn Management had with a third party – CoreLogic SafeRent. Id. at 59; Addy Dep. at 78-79. The leasing agent would provide CoreLogic SafeRent with the applicant's name, date of birth and social security number, and CoreLogic SafeRent would provide a credit check and criminal history report. Addy Dep. at 126; Sanchez Dep. at 51-52. Assuming the applicant met the credit and criminal history benchmarks, the leasing agent would proceed to the next step of the screening process – evaluating landlord history. Sanchez Dep. at 56-57; Addy Dep. at 127-28; see Resident Selection Plan at 15. Although the Resident Selection Plan provides that the applicant's rental history "will be reviewed and rated by a national scoring firm," the record reflects that The Pines used their own employees to screen rental history. The leasing agent would review the application, and mail or fax the prior landlords a form which asked for information about the applicant's prior rental history. Sanchez Dep. at 56, 62-63; Addy Dep. at 80-81, 96. If a response was not received from the landlord within two or three days, a second attempt to obtain the information would be made by fax, mail or a telephone call, depending on the leasing agent's choice, and the landlord information provided by the applicant. Sanchez Dep. at 65; Addy

Dep. at 93, 96.

According to Ms. Sanchez, the leasing software program kept track of where every applicant was in the screening process and the program would not permit the leasing agent to move from one step to the next until each step had been completed in the required order. Sanchez Dep. at 64. If the landlord did not or could not provide the rental history information, the leasing agent would sometimes contact the applicant and tell them their previous landlord had not responded or was unreachable. Id. at 66-67. Sanchez testified that it would normally take three to four days to process an application. Id. at 68. Ms. Addy testified that if a landlord did not respond to their requests for rental history information, the application would be denied for lack of information and the applicant would be mailed a denial letter. Addy Dep. at 96-97. If the applicant, upon receiving the denial letter, called and requested additional time to provide contact information for the landlord, Addy testified The Pines would "re-open the application and attempt [to contact the landlord] again." Id. at 97. Addy acknowledge that if the landlord failed to respond to repeated attempts, the applicant would "be held responsible" and the application denied. Id. This was, in part, because there was time pressure to fill vacant apartments as leasing agents were "processing 48-50 applications" at a time. Id. at 147. "If we do our due

11

diligence and we're still not getting a response, it becomes denied and the burden is back on the applicant to get us the information we need or talk to the landlord to get them to respond." Id. at 147-48.

During their depositions, both Addy and Sanchez reviewed plaintiffs' application and testified about how it was processed. After plaintiffs completed application was received, the required identifying data was electronically submitted to CoreLogic SafeRent on October 19, 2009. Id. at 102-04. CoreLogic SafeRent ran a credit and a criminal history check of both plaintiffs Williams and Peek, and notified the Pines that they each met both screening criteria. Id. at 105-08. Having passed the first two screening requirements, plaintiffs' application went "on for further processing." Id. at 105.

As per the Residential Selection Plan, the application was next screened for landlord history. Plaintiffs' rental application listed five previous residences, although it appears that only three were described with sufficient particularity so as to allow mail or fax communication.[4] After attempting to contact the listed landlords with the information supplied by plaintiffs, The Pines received two returned landlord references.

---

[4] The address for one previous residence was simply listed as "Cairo, Egypt." On another, the landlord was identified as only "Jennifer" with no address of the residence, although plaintiffs did provide the name of the apartment complex. See Pl.'s App.

12

The first was from Shane Peek, plaintiff Peek's brother, who personally delivered[5] the form to The Pines' rental office. See Addy Dep. at 84. However, the form was incomplete as Shane Peek failed to answer any of the pertinent landlord history questions. The form referenced an "attachment," but Mr. Peek did not provide any attachment or further information. See Pl.'s App.; Addy Dep. at 84-85. The second form returned was from Joe D'Alessandro, plaintiffs' landlord at the time they were applying to live at The Pines. Mr. D'Alessandro returned a properly completed form, but the form was nevertheless problematic in meeting The Pines' screening criteria. Mr. D'Alessandro indicated that plaintiffs were fine tenants, but they were also in the midst of their lease with him and, if they did move out, he would "probably" not rent to them again because "their lease was not fulfilled." See Pl.'s App. Ms. Addy testified that this reference would not be considered an acceptable landlord reference because a prior lease was not fulfilled. Addy Dep. at 86-87. No other landlord forms were returned. Having determined that plaintiffs did not meet the rental history screening requirement, The Pines did not proceed any further in screening plaintiffs' application. According to plaintiffs, they were not mailed a denial letter, but instead

---

[5] The form was originally mailed to Shane Peek and was returned to The Pines because he was not at the address provided on the application. Plaintiffs contacted Mr. Peek and he subsequently hand-delivered the form to the rental office. Addy Dep. at 84.

13

had to inquire about their application before receiving one. Peek Dep. at 53. The letter cited "poor rental history" as the reason for the denial. See Ex. "F" attached to Def.'s Mot. for Summ. J. (Docket # 55-9); Addy Dep. at 128-129. When shown the letter plaintiffs claim they sent to The Pines seeking to appeal the denial, Ms. Addy testified that she did not recall receiving it. In any event, no appeal was ever processed by The Pines. Addy Dep. at 109-10.

## Discussion

Summary Judgment Standard: Summary judgment is appropriate where "the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "By its very terms, the standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). A dispute of fact is material "only if it has some effect on the outcome of the suit." Eagley v. State Farm Ins. Co., No. 13-CV-6653P., 2015 WL 5714402, at *5 (W.D.N.Y. Sept. 29, 2015) (citation and quotation omitted). Moreover, a genuine issue exists as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

14

party." Anderson, 477 U.S. at 248. When deciding a summary judgment motion, courts must resolve all inferences and ambiguities in favor of the party against whom summary judgment is sought. Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990); Donahue v. Windsor Locks Bd. Of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir. 1987). The reasonableness of those inferences, though, depends on "the record taken as a whole." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The burden of showing the absence of any issue of material fact rests with the movant. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has established its prima facie entitlement to summary judgment, the burden shifts to the non-moving party to "go beyond the pleadings and by . . . affidavits, or by the depositions, answers to interrogatories, and admission on file, designate specific facts showing that there is a genuine issue for trial." Id. at 324 (internal citations omitted). Put differently, the non-moving party must show that materials cited "establish . . . the presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). It is not enough for the non-movant to present evidence that just raises doubts; the non-movant must present "concrete evidence from which a reasonable juror could return a verdict in

15

his favor." Anderson, 477 U.S. at 256. The "mere existence of a scintilla of evidence" to support the non-moving party's claims is insufficient to defeat a motion for summary judgment. Id. at 252.

In evaluating the merits of a summary judgment motion in the context of a discrimination claim, this Court must be cautious in granting relief where the conduct at issue "requires an assessment of individuals' motivations and state of mind . . . ." Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001). These are "matters that call for a sparing use of the summary judgment device because of juries' special advantages over judges in this area." Id. (internal quotations and citations omitted). Nevertheless, "the salutary purposes of summary judgment - avoiding protracted, expensive, and harassing trials - apply no less to discrimination cases than to commercial or other areas of litigation." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). Indeed, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d Cir. 1994); see also Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."). Ultimately, at this stage, the trial court is limited to "issue-finding," and

not resolution, while keeping "in mind that only by reference to the substantive law can it be determined whether a disputed fact is material to the resolution of the dispute." Gallo v. Prudential Residential Serv., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Discrimination Under the Fair Housing Act: "The Fair Housing Act makes it unlawful '[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.'" Mitchell v. Shane, 350 F.3d 39, 47 (2d Cir. 2003) (quoting 42 U.S.C. § 3604(b)). Claims brought under the FHA are subject to the familiar burden shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Id. (citing Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, 1038 (2d Cir. 1979)). "To make out a prima facie discriminatory housing refusal case, a plaintiff must show that he is a member of a statutorily protected class who applied for and was qualified to rent or purchase housing and was rejected although the housing remained available." Soules v. U.S. Dep't. of Housing and Urban Dev., 967 F.2d 817, 822 (2d Cir. 1992). Assuming a plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to assert a legitimate,

nondiscriminatory rationale for the challenged decision. See McDonnell Douglas, 411 U.S. at 802-03. The burden then shifts back to the plaintiff, who bears the ultimate burden of demonstrating that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). In this pretext stage, the plaintiff must

demonstrate that the proffered reason was not the true reason for the [housing] decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the [defendant] or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence.

Id. at 256 (citing Mcdonnell Douglas at 804-05). It is plaintiffs' burden to show that religious discrimination was a motivating factor, although not necessarily the sole motivating factor, for defendants' rejection of their application for housing. Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, 1042-43 (2d Cir. 1979).

The Merits of Defendants' Summary Judgment Motion: While defendants do not concede any step of the McDonnell Douglas burden shifting analysis, for purposes of the motion before the Court defendants assume that plaintiff can establish a prima facie case of housing discrimination. See Cleveland v. Bisuito, No. 03-CV-6334 CJS(F), 2004 WL 2966927, at *4 (W.D.N.Y. Dec. 21,

18

2004) ("Proving a prima facie case requires only a *de minimis* showing that there exists a triable issue of fact."). Defendants argue that even assuming plaintiffs meet the *de minimis* burden of proving a prima facie case of housing discrimination, defendants have supplied a legitimate non-discriminatory reason for their refusal to rent to plaintiffs, and plaintiffs have failed to show that the proffered reason is pretextual. See Def.'s Mem. of Law (Docket # 55-1).

The Court agrees that the defendants have supplied a legitimate, nondiscriminatory rationale for their decision not to rent an apartment to plaintiffs. Section XII of The Pines' Resident Selection Plan sets forth the "Applicant Screening" criteria. Under Section XII, the screening criteria are (1) Credit History; (2) Criminal History; (3) Rental History; and (4) Income Verification. While plaintiffs met the first two criteria, the evidence confirms that the defendants were unable to verify a rental history that met the third step of the screening criteria.

HUD regulations permit the owners of rental housing units to "screen families on the basis of their tenancy histories." 24 C.F.R. § 982.307(a)(3); see Morales v. Related Mgmt. Co., No. 13-CV-8191, 2015 WL 7779297, at *6 (S.D.N.Y. Dec. 2, 2015) ("HUD's applicable regulations permit the owners of rental housing units to 'screen families on the basis of their tenancy

19

histories,' which includes the payment of rent."); Bourbeau v. Jonathan Woodner Co., 549 F. Supp. 2d 78, 87 (D.D.C. 2008) ("Landlords remain free not to rent to voucher holders provided they do so on . . . legitimate, non-discriminatory grounds, such as an applicant's rental history or criminal history."). Here, plaintiffs cannot reasonably dispute that they did not satisfy the rental history requirement set forth in the Resident Selection Plan. The information plaintiffs provided in their rental application did not meet the five year rental history requirement and the contact information was deficient for at least two of the five landlords provided. Only two of the five listed landlords submitted the requested forms and one of them, a relative, did not fill out any of the requested information on the form. The other, plaintiffs' current landlord, did not provide an entirely favorable reference because he noted that if plaintiffs moved, they would necessarily break their current lease with him. Accordingly, defendants have submitted admissible evidence supporting a legitimate non-discriminatory reason for the rejection of plaintiffs' housing application – plaintiffs failed to provide sufficient information for The Pines to verify a satisfactory rental history pursuant to the requirements of the screening criteria.

The crux of plaintiffs' argument, therefore, focuses on the final step of the McDonnell Douglas analysis – plaintiffs'

20

burden to demonstrate by admissible evidence that the defendants' explanation is false and is a pretext for intentional discrimination. In their initial Memorandum of Law (Docket #59), plaintiffs argue that the manner in which plaintiffs' application was processed raises an issue of fact as to whether defendants' rejection of the application for insufficient landlord history was pretextual. According to counsel for plaintiffs, the defendants did not follow "standard procedures" in screening plaintiffs' application and these variances are evidence of religious discrimination. For example, plaintiffs allege that the Pines' standard procedures required a personal interview to make sure an application was completed before being accepted for processing. See Sanchez Dep. at 71 ("[w]e just look to make sure they have five-year landlord history on there that it's completed"). Here, although Ms. Sanchez initialed plaintiffs' application and date-stamped it, she accepted the application without comment although it did not list five years of landlord history. Id. at 69-72; Williams Dep. at 11-12. Plaintiffs also allege that although Ms. Sanchez accepted the application, she was not the leasing agent and "assumed the leasing agent would verify the five year history." See Pl.'s Mem. of Law (Docket # 59) at 3. Plaintiffs point to the fact that Ms. Sanchez stated that although she may have received the application, she was not a leasing agent in October

21

2009 and did not process applications or verify landlord references at that time. See Sanchez Dep. at 69-74. Sanchez stated that the handwritten processing notes on the application were not hers. Id. at 85-86. However, Michelle Addy, property manager for Winn Residential, stated that Kiera Sanchez handled the initial review of plaintiffs' application and that Ms. Sanchez's handwriting was on the application. See Addy Dep. at 84.

In evaluating plaintiffs' argument that "standard procedures" were not followed in processing plaintiffs' application, this Court will assume plaintiffs to be correct. Indeed, this Court will go further. While The Pines may have adopted legitimate screening criteria for prospective tenants, the manner in which it implemented those criteria with respect to prior rental history was not only unfair to plaintiffs, it was unfair to any prospective tenant who was unlucky enough to have a landlord who would not immediately respond to a form letter seeking rental history information. With a long waiting list, The Pines had the luxury of rejecting applications from individuals who would be perfectly good tenants, simply because their previous landlords refused, were too busy, or were simply unwilling to respond in a matter of days to a form letter seeking rental history information. While some former landlords might be corporate entities with employees willing to respond to

22

such inquiries, individual landlords might not be willing or able to timely provide rental history data. Properties are sold, landlords change, and if a previous landlord did not provide a forwarding address, how was a prospective tenant supposed to provide accurate contact information? Moreover, it is clear from the deposition testimony that The Pines had no "standard procedure" on how to verify landlord history, no uniform requirement of how many letters to send out, when to follow up with a phone call, and when to contact the applicant to let them know that a landlord was unresponsive or unreachable. It also seems clear from the record that the reason The Pines did not have a standard procedure was that it didn't need to. If the provided information on the housing application form did not yield a favorable reference within a week or two, it was easier for the leasing agents to move on to the next application rather than following up with an otherwise qualified prospective tenant.

Thus, the record supports plaintiffs' claim that they were treated unfairly. But the same record does not support the gravamen of plaintiffs' complaint – that they were treated unfairly due to their religious beliefs. Plaintiffs cannot rebut defendants' proffered explanation merely by showing that the explanation is false: "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the

reason was false, and that discrimination was the real reason."
St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)
(emphasis supplied). As the Second Circuit has stated, "[t]o
get to the jury, it is not enough to disbelieve the
[defendants]; the factfinder must also believe the plaintiff's
explanation of intentional discrimination." Weinstock v.
Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (internal
quotations, alterations, and citations omitted). Therefore,
"[t]o defeat [defendant]'s motion for summary judgment,
[plaintiff] was obliged to produce not simply 'some' evidence,
but 'sufficient evidence to support a rational finding that the
legitimate, nondiscriminatory reasons proffered by the
[defendant] were false, and that more likely than not
[discrimination] was the real reason for the [action].'" Van
Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir.
1996) (citing Woroski v. Nashua Corp., 31 F.3d 105, 110 (2d Cir.
1994) (additional citations omitted)). Plaintiffs need not
demonstrate that discrimination based upon religious beliefs
"was the sole reason they were denied housing, only that it was
a motivating factor in the defendant's decision." Swinton v.
Fazekas, No. 06-CV-6139T, 2008 WL 723914, at *5 (W.D.N.Y. Mar.
14, 2008).

Despite years of discovery and ample opportunity to do so,
plaintiffs have not adduced sufficient admissible evidence that

would support a finding that the reason defendants assert Mr. Peek and Ms. Williams were denied housing – a lack of verifiable rental history – was intended to mask purposeful discrimination based on plaintiffs' religious beliefs. Plaintiffs' proof that The Pines failed to follow its own internal rules for processing tenant applications, even if true, does not, on this record, provide sufficient evidence "from which a reasonable jury could find that it was pretext to hide a discriminatory motive." See Kennedy v. Related Management, 403 F. App'x 566, 568-69 (2d Cir. 2010); see also Singh v. Air India Ltd., 108 F. App'x 9, 10 (2d Cir. 2004) (affirming dismissal of plaintiff's discrimination claim because, even if the evidence "did demonstrate pretext," plaintiff failed to "present evidence that would permit a rational jury to conclude that this was a pretext for age discrimination"). This Court remains mindful that a "smoking gun" proving intentional discrimination is rarely available and "intent often must be inferred from circumstantial evidence found in affidavits and depositions." Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001). But here, viewing the evidence submitted in the light most favorable to plaintiffs, there simply is a lack of evidence to suggest, let alone infer, that the defendants' denial of plaintiffs' housing application was motivated in whole or part by religious discrimination.

Perhaps sensing that direct evidence of religious

25

discrimination was lacking, plaintiffs alleged at oral argument and in their post-hearing Memorandum of Law that defendants engaged in a "pattern and practice" of rejecting "eligible minority applications under the pretext that they failed to meet admission criteria." See Docket #64 at 2. Plaintiffs point to the portion of Ms. Addy's deposition testimony where she was asked to review other applications that were rejected due to insufficient landlord references.[6] Id. at 2-3. The rejected applicants were identified as racial minorities, including Hispanic, non-Hispanic Latino, Asian, and Pacific Islander. Plaintiffs argue that this "pattern" of discrimination against racial minorities is corroborated by statistical evidence kept by the defendants which, according to plaintiffs, show that 66.57% of The Pines' units have heads of households who are white. Id.

In making their "pattern" argument, plaintiffs acknowledge that they have no statistical evidence regarding the religious preferences of any residents of The Pines because the defendants do not collect such information. According to plaintiffs, however, the Court may rely on evidence of generalized racial discrimination in the application process as evidence of defendants' specific religious discrimination in this case.

---

[6] For reasons unknown to the Court, plaintiffs' counsel did not attach copies of the referenced applications to their motion papers, and thus the applications are not part of the record.

There are several problems with plaintiffs' "pattern and practice" argument.

First, plaintiffs' reliance on other rejected applications fails to reveal a pattern or practice of discrimination. Plaintiffs' counsel showed Ms. Addy a number of applications from "racial minority" applicants who were rejected due to insufficient landlord references. Ms. Addy went through each application and indicated why the landlord reference was insufficient. For example, the application of Michelle Santiago, marked as Exhibit 5 at the deposition, was rejected for "landlord history." Ms. Addy testified that this application was rejected because the applicants were not the lease holders at the referenced apartment. See Addy Dep. at 129-30. Exhibit 6, an application for Mr. Han Throng, was rejected because a landlord responded that it was "to be determined" if they would rent to Mr. Throng in the future because they would want to know if he would cause damage once he relocated. Id. at 131. Exhibit 7, an application for Billio Camilo, was rejected for poor landlord history because a landlord responded that the applicant was not current with the rent, that he was late every month, and that eviction proceedings had begun. Id. at 135. In Exhibit 8, the applicant was rejected because a prior landlord said she was late with rent four times. Id. at 137. Applicant Terasa Harris, Exhibit

9, was rejected because her landlord did not return a reference. Id. at 140-44. Exhibit 10, Dennis Cherry, was rejected because none of the landlord references were returned. Id. at 145-46. With no context for these applications, and no comparisons of similar applications where the applicant was granted housing, the Court simply cannot make any inference of discrimination, racial or otherwise. Plaintiffs might have used a sample of applications to show disparate treatment in a myriad of ways, such as showing the race or ethnicity of applicants who were accepted in spite of their insufficient landlord history. Or plaintiffs could have developed evidence that the time and effort The Pines' puts into contacting landlords and confirming an applicant's rental history varied depending on the race or ethnicity of the applicant. Absent direct evidence of an improper motive, an inference of discrimination can often most readily be generated through evidence of unfavorable treatment of a plaintiff and then comparing that treatment to similarly-situated individuals.[7] Given the absence of such comparisons

---

[7] Indeed, the primary case relied upon by plaintiffs in arguing that the defendants' "failure to follow up to obtain additional rental information" creates a question of fact as to disparate treatment only confirms the lack of evidence of disparate treatment here. See Docket #64 at 2. In Davis v. Mansard, 597 F. Supp. 334 (N.D. Ind. 1984), plaintiffs claimed that although the apartment complex had both black and white tenants, black applicants were subjected to far more scrutiny than white applicants. The court held that although there were legitimate criteria to screen prospective tenants, "the facts show, however, a pattern of treating black and white apartment seekers of similar backgrounds and earnings differently, to the detriment of the blacks." Id. at 345. Despite ample opportunity to develop facts showing a pattern of subjecting non-white applicants to greater scrutiny of their rental history than white applicants, no such evidence has been presented by

28

after seven years of discovery and the opportunity for post-hearing submissions, the Court can only assume that this evidence of discrimination based on disparate treatment does not exist.

Plaintiffs' reliance on statistical evidence is equally unpersuasive. "It is well-settled that an individual disparate treatment plaintiff may use statistical evidence regarding an employer's general practices at the pretext stage to help rebut the employer's purported nondiscriminatory explanation." Hollander v. American Cyanamid Co., 895 F.2d 80, 84 (2d Cir. 1990) (citations omitted). "Evidence relating to company-wide practices may reveal patterns of discrimination against a group . . . increasing the likelihood that a [defendant's] offered explanation for a . . . decision regarding a particular individual masks a discriminatory motive." Id. Here, even if the Court were to consider racial disparities as evidence of religious discrimination, the Court can assign no specific meaning from the raw statistical numbers relied on by plaintiffs. Plaintiffs claim that data maintained by the defendants show that 66.5% of residents at The Pines are White, and that 33.5% are Asian, Black, Native America, Other, or Declined to Report. See Continuation of Exhibits (Docket # 62). Such evidence is meaningless without context. What is the

plaintiffs here.

racial breakdown of the applicant pool? What is the racial make-up of the relevant community that is being used for comparison? What is the racial make-up of other similar housing complexes? In the absence of context, or better yet, an expert opinion containing an analysis of the statistical significance of this data, this single raw data point measuring the racial composition of The Pines does not, on its own, support an inference of religious discrimination. See Lomotey v. Connecticut-Dep't of Transp., 355 F. App'x 478, 481 (2d Cir. 2009) (finding that statistical evidence "amounts to nothing more than raw numbers which, without further information on key considerations such as the racial composition of the qualified labor pool, cannot support an inference of discrimination"); see also Weinstock v. Columbia Univ., 224 F.3d 33, 46 (2d Cir. 2000) (rejecting argument that "raw data purportedly describing a pattern of under-representation and unequal opportunity for women faculty at Columbia leads to the conclusion that gender discrimination is in play here," as "little but an unsupported hypothesis providing no foundation for the assertion that there was discrimination"); Odom v. Frank, 3 F.3d 839, 849 (5th Cir. 1993) (raw data of age, race, and location of persons promoted from 1980–1983, "without more, is not competent to prove anything"); Hosick v. Chicago State Univ. Bd. of Trustees, 924 F. Supp. 2d 956, 969 (N.D. Ill. 2013) (noting that "[w]ithout any

30

statistical analysis" raw racial composition statistics are "next to worthless"); Hague v. Thompson Distribution Co., 436 F.3d 816, 829 (7th Cir. 2006) ("The plaintiffs must do more than merely point to [racial composition statistics] and proclaim: 'Aha! Discrimination.'").

In sum, even if the evidence relied on by plaintiffs could tend to establish that defendants' reason for denying the application was pretextual, plaintiffs have failed to put forward evidence sufficient to demonstrate that a motivating factor for the denial was religious discrimination. See Mitchell v. Shane, 350 F.3d 39, 47 (2d Cir. 2000) (summary judgment is appropriate if no reasonable jury could find that the defendant's actions were motivated by discrimination).

## Conclusion

For the reasons stated above, it is the judgment of this Court that defendants' motion for summary judgment (Docket # 55) is granted. This action is **dismissed** and the Clerk of Court is directed to enter a judgment for the defendants.

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:     September 30, 2017
           Rochester, New York